**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBYN MOORE and GABRIELLE STUVE, on behalf of themselves and all others similarly situated,** | |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **BEECH-NUT NUTRITION COMPANY,** | 1:21-cv-183 (FJS/DJS) |
| *Defendant.* | |

## CLASS ACTION COMPLAINT

Plaintiffs Robyn Moore and Gabrielle Stuve ("Plaintiffs"), by and through their counsel, on their own behalf and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Beech-Nut Nutrition Company ("Beech-Nut" or "Defendant") and allege the following facts in support of their claims against Defendant based upon personal knowledge, where applicable, information and belief, and the investigation of counsel:

## I.    INTRODUCTION

1.      Parents and other caregivers, including Plaintiffs, reasonably believe that the baby food they purchase for their babies will be healthy, nutritious, and non-toxic, and that is what Defendant wanted them to think.  Alarmingly, parents and Plaintiffs were wrong.  A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform ("House Subcommittee") reveals that certain brands of commercial baby food – including Beech-Nut's food products (the "Tainted Baby Foods") – are tainted with significant and dangerous levels of toxic heavy metals, including but not limited to arsenic, lead, mercury, and cadmium. *See Baby Foods Are Tainted with Dangerous Levels of*

*Arsenic, Lead, Cadmium and Mercury*, Staff Report Dated February 4, 2021, Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform, U.S. House of Representatives (the "Congressional Report").[1]  Exposure to toxic heavy metals causes permanent decreases in IQ and endangers neurological development and long-term brain function, among numerous other deleterious alarming conditions and problems.

2.     Plaintiffs bring this class action against Defendant for deceptive business practices, including misrepresentations and omissions, regarding the presence of dangerous levels of toxic heavy metals and other contaminants contained within their Beech-Nut baby foods, including those that Plaintiffs purchased.  Plaintiffs seek injunctive and monetary relief on behalf of the proposed Class including (i) requiring full disclosure of all such substances and ingredients in Defendant's marketing, advertising, and labeling; (ii) requiring testing of all ingredients and final products for such substances; and (iii) restoring monies to the members of the proposed Class.

3.     No reasonable consumer purchasing baby foods or seeing Defendant's representations in advertising would expect the baby foods to contain dangerous levels of heavy metals or other undesirable toxins or contaminants.  Furthermore, reasonable consumers, like Plaintiffs, would consider the inclusion of dangerous levels of heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

4.     Defendant intended for consumers to rely on its representations, and reasonable consumers did in fact so rely.  However, Defendant's business practices, representations and omissions were deceptive, misleading, unfair, and/or false because, among other things, the

---

[1] *Available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed February 16, 2021).

Tainted Baby Foods contained undisclosed dangerous levels of toxic heavy metals or other undesirable toxins or contaminants.

5.      Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for personal/household use and not resale any of Defendant's Tainted Baby Foods.   Through this action, Plaintiffs assert claims for unjust enrichment, and violations of New York General Business Law §§ 349 and 350, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PS § 201 *et seq.* seeking monetary damages, injunctive relief, and all other relief as authorized in equity or by law.

## Parties

### *Plaintiffs*

6.      Plaintiff Robyn Moore is a citizen and resident of the State of Pennsylvania, residing in Tobyhanna, Pennsylvania.  During the applicable statute of limitations period, Plaintiff Moore purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Beech-Nut Naturals Just Sweet Potatoes and Organics Just Sweet Potatoes.

7.      Plaintiff Gabrielle Stuve is a citizen and resident of the State of New York, residing in Hauppauge, New York.  During the applicable statute of limitations period, Plaintiff Stuve purchased Tainted Baby Foods that were manufactured and produced by Defendant that have been found to contain dangerous levels of toxic heavy metals, including Beech-Nut Naturals Prunes.

***Defendant Beech-Nut Nutrition Company***

8.     Defendant Beech-Nut Nutrition Company is a Delaware corporation with its principal place of business located at One Nutritious Place, Amsterdam, New York, 12010. Defendant is a citizen of the State of New York.

9.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Tainted Baby Foods throughout the United States, including New York and Pennsylvania.

10.     Defendant states on its website, "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority." It further touts its "Food Quality & Safety":

> We take our responsibility very seriously to find the purest, cleanest fruits and vegetables out there, while adhering to rigorous quality standards. … **<u>We've been testing our ingredients for contaminants such as heavy metals and pesticides since 1985, and we're aware of no higher standards in the industry than ours</u>**. Beech-Nut prides itself on its partnerships with farmers to help ensure that they understand, and can meet, the level of quality we require. We continuously improve our food safety and quality standards based on the most up to date scientific technology. We also seek guidance from sources such as the Food and Drug Administration (FDA), Environmental Protection Agency (EPA), the European Food Safety Authority (EFSA) and the World Health Organization (WHO).[2] (Emphasis added).

Moreover, Defendant represents: "We're proud to offer natural and organic products that are free from artificial preservatives, colors and flavors. **In fact, we conduct over 20 rigorous tests on our purees**, testing for up to 255 pesticides **and heavy metals (like lead cadmium, arsenic and other nasty stuff).**" (Emphasis added).

11.     Defendant further represents on its website that it is a founding member of the Baby Food Council, which was established in January 2019 "to create science-based standards for reducing levels of heavy metals in food products to as low as reasonably achievable, using best-

---

[2] *See, e.g.,* www.beechnut.com/food-quality-safety/ (last accessed February 16, 2021).

in-class management techniques."[3]   Defendant goes on to state: "As industry leaders, we understand that creating standards specific to baby food is the best way to lead the food industry and continuously make baby food that is safe.  That's why, as part of the Baby Food Council, we have been partnering with key stakeholders, including the FDA, to create Baby Food Standards for contaminants management across the entire industry. We are committed to delivering these high standards[.]"[4]

12.     Defendant sells baby food products in the form of cereal, jars, pouches, and snacks. The Congressional Report concludes that a large a large portion of such products are tainted and contain dangerous levels of toxic heavy metals.

## Jurisdiction and Venue

13.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d)(2), because at least one Class Member is of diverse state citizenship from Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

14.     The Northern District of New York has personal jurisdiction over Defendant as Defendant is headquartered in this District and conducts substantial business in this State and in this District through its headquarters, sale of products, and commercial website.

15.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant has its principal place of business in this District and because a substantial part of the events, misrepresentations and/or omissions giving rise to the conduct alleged in this Complaint occurred in, were directed to, and were emanated from this District.

---

[3] *Id.*
[4] *Id.*

## II.     FACTUAL ALLEGATIONS

### Congressional Investigation Finds Dangerous Levels of Heavy Metals in Baby Foods

16.     On February 4, 2021, the House Subcommittee issued its Congressional Report detailing its findings that heavy metals, including arsenic, cadmium, lead, and mercury ("Heavy Metals"), were present in dangerously "significant levels" in numerous commercial baby food products.

17.     The FDA and the WHO have declared Heavy Metals dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects.  Even low levels of exposure can cause serious and often irreversible damage to brain development.  *See* Congressional Report at 2.  In fact, children's exposure to toxic heavy metals causes, among other things, permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior.[5]  *See id*. at 9.  The FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure.[6]

18.     On November 6, 2019, following reports alleging high levels of toxic heavy metals in baby foods, the House Subcommittee requested internal documents and test results from seven of the largest manufacturers of baby food in the United States, including both makers of organic and conventional products.  *See id*. at 2.  One of those companies was Defendant.  *See id*.

---

[5] Miguel Rodriguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioral Disorders in Children:  A Systematic Review and Meta-Analysis* (April 9, 2013) (*available at* www.sciencedirect.com/science/article/abs/pii/S0048969713003409?via%3Dihub (last accessed February 16, 2021).
[6] Food and Drug Administration, *Metals and Your Food* (*available at* www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food (last accessed February 16, 2021).

19.     Defendant responded to the House Subcommittee's requests and produced its internal testing policies, test results for ingredients and/or finished products, and documentation about what it did with ingredients and/or finished products that exceeded its internal testing limits. *See id*.

20.     The FDA and other organizations have set rules and/or issued guidelines and recommendations as to the maximum allowable or advisable and safe levels in various different types of products of inorganic arsenic, lead, cadmium and mercury.  *See generally id*. at Point II. In many instances, the test results of Defendant's baby foods and their ingredients eclipse those levels for inorganic arsenic, lead, and cadmium, and Defendant does not even test for mercury. *See id*. at Findings, at 2-5.

**Arsenic**

21.     As per the Congressional Report, arsenic is ranked as number one for "substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR)."  *Id.* at 10.  Arsenic exposure has severe health risks, including damage to the central nervous system and cognitive development in children.  *See id.*  Full Scale IQ is severely negatively affected in children for verbal and performance domains and memory. *See id.*  One study concluded that 5 ppb of arsenic in drinking water caused children to have significant reductions in Full Scale IQ and other related scores.  *See id.*

22.     The Congressional Report further states, "There is no established safe level of inorganic arsenic consumption for babies." *Id.* at 13.  While certain organizations such as Healthy Babies Bright Futures contend that there should be a goal of no measurable inorganic arsenic in baby food, Consumer Reports suggests it should be no more than 3 ppb. *See id.*  For bottled water,

the FDA has set the maximum inorganic arsenic level at 10 ppb and the EPA has set a 10 ppb cap

on drinking water, as have the European Union (EU) and WHO.  *See id.*  The FDA has only set

one final standard to date, which is a 100 ppb limit for inorganic arsenic for infant rice cereal.  *See*

*id.* at 37.

23.     According to the Congressional Report, Defendant tested for arsenic content in its

ingredients but not its final baby food product.  *See id.* at 17.  The Congressional Report concluded

that Defendant "used ingredients in its baby foods with as much at 913.4 ppb arsenic; Beech-Nut

routinely used ingredients that exceeded 300 ppb total arsenic; Beech-Nut unnecessarily uses high-

arsenic additives to address issues like 'crumb softness.'" *Id.*

24.     The Congressional Report further stated that "[t]he six Beech-Nut ingredients with

the highest arsenic levels—Amylase, BAN 800, Alpha Amylase, and Sebamyl 100—are all

enzymes that Beech-Nut adds to its products." *See id.* at 18.  BAN 800 is an enzyme that reportedly

increases crumb softness in baked goods.  *Id.*  Amylase is an enzyme that is used in bread-making

as an additive to improve the conversion of complex sugars into simple sugars that yeast are then

able to feed on and produce alcohol and CO2.  *See id.* at 18-19.

25.     With respect to Beech-Nut's internal standards, the Congressional Report

concluded that "Beech-Nut set internal arsenic … standards at 3,000 ppb in dangerous additives,

such as vitamin mix[.]" *See id.* at 37. According to the Report, Beech-Nut's "standards are the

highest of any responding manufacturer." *Id.*

26.     On the FAQs page of its website, Beech-Nut provides the following answer to the

question of whether Beech-Nut baby foods contain arsenic:

> Our foods are and have been below the proposed FDA arsenic limit for rice cereals.
> Rice is an important staple for many people. All consumers, including pregnant
> women, infants and children, are encouraged to eat a well-balanced diet for good
> nutrition – without an excess of any one food. The American Academy of Pediatrics

currently recommends feeding infants and toddlers a variety of grains, including rice, as part of a well-balanced diet.[7]

This statement is materially false and misleading and omits material information concerning Defendant's testing policies and standards.

**Lead**

27.     The Congressional Report noted that lead is number two on ATSDR's list of substances that pose the most serious threat to human health.  *See* Congressional Report at 11. Even small amounts of exposure are dangerous, especially for children, and can cause behavioral issues, decreased cognitive performance, delayed puberty, and reduced postnatal growth.  *See id.* Early childhood lead exposure negatively affects school performance and test scores.  *See id.* These effects can be permanent.  *See id.*

28.     As the Congressional Report states, "There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb."  *Id.* at 21.  In other products, the FDA set a 5 ppb lead standard for bottled water; the WHO set a 10 ppb provisional guideline for drinking water; the EPA set an action level of 15 ppb in drinking water; the FDA set standards for juice at 50 ppb and candy at 100 ppb; and the EU set a maximum level of 20 ppb in infant formula. *See id.*

29.     According to the Congressional Report, Beech-Nut only tested for lead in its ingredients and did not routinely test its finished product for lead.  *Id*. at 22, 23.  The Congressional Report concluded that Beech-Nut "used ingredients containing as much as 886.9 ppb lead" and "routinely used ingredients with high lead content, including 483 ingredients that contained over 5 ppb lead, 89 ingredients that contained over 15 ppb lead, and 57 ingredients that contained over

---

[7] https://www.beechnut.com/frequently-asked-questions/ (last accessed February 16, 2021).

20 ppb lead." *Id*. at 23.  For instance, Beech-Nut used cinnamon that contained 886.9 ppb lead.
*Id*.

30.      The Congressional Report further stated that Beech-Nut set internal guidelines of
5,000 ppb for lead for certain ingredients, which "far surpass[es] any existing regulatory standard
in existence and toxic heavy metal levels for any other baby food manufacturer that responded to
the Subcommittee's inquiry."  *See id.* at 38.

31.      On the FAQs page of its website, Beech-Nut provides the following answer to the
question of whether Beech-Nut baby foods contain lead:

> Even the highest quality, organic and non-GMO fruits and vegetables contain trace
> amounts of lead because this contaminant commonly occurs naturally in soil. The
> FDA states that: 'Because lead may be present in environments where food crops
> are grown and animals used for food are raised, various foods may contain
> unavoidable but small amounts of lead that do not pose a significant risk to human
> health.' We have strict standards and test for up to 255 contaminants for every batch
> of food we make. Read about our Food Quality and Safety standards here.[8]

This statement is materially false and misleading and undermined by the Congressional Report's
findings of high levels of lead in Beech-Nut products.

**<u>Cadmium</u>**

32.      The Congressional Report states that cadmium is seventh on ATSDR's list of
substances in the environment that pose the most serious threat to human health.  *See*
Congressional Report at 12.  Cadmium has been associated with decreases in IQ and ADHD.  *See*
*id.*

33.      Outside of baby foods, the EPA has a 5 ppb limit for drinking water; the FDA has
a 5 ppb limit for bottled water; and the WHO has a 3 ppb limit for drinking water.  *See id.* at 29.
Healthy Babies Bright Futures contends there should be no measurable cadmium in baby food and

---

[8] https://www.beechnut.com/frequently-asked-questions/ (last accessed February 16, 2021).

Consumer Reports' position is there should be a limit of 1 ppb cadmium in fruit juices.  *See id.*
The EU set a limit from 5-20 ppb cadmium for infant formula.  *See id.*

34.     The Congressional Report concluded that Beech-Nut "used twenty ingredients
registering over 100 ppb cadmium, including cinnamon containing 344.5 ppb cadmium[,]" which
is "more than 17 times higher than the EU's lax upper limit on cadmium in baby food."  *Id*. at 29-
30.  At least 105 ingredients that Beech-Nut tested and used in its baby foods registered at or over
20 ppb cadmium—the EU's lax infant formula upper limit.  *Id*. at 30.

35.     According to the Congressional Report, Beech-Nut set its internal cadmium
standards at 3,000 ppb in dangerous additives, which was the "highest of any responding
manufacturer."  *See id.* at 37.

36.     Notably, the Congressional Report found that Beech-Nut sold eleven products that
surpassed even its own internal cadmium limits.  *See id.* at 38.  For example, "Beech-Nut accepted
dehydrated potato containing 119.6, 143.5, and 148.4 ppb cadmium, far surpassing its own internal
limit of 90 ppb for that ingredient."  *Id*.

37.     According to the Congressional Report, Beech-Nut's explanation of why it
accepted products over its own internal limits was that it did so "rarely", and the ingredients were
"generally restricted to a 20% variance of BNN's allowable limits…."  *Id*. at 39.  However, as the
cadmium examples show, Beech-Nut accepted certain ingredients despite its own testing results
which showed that the ingredients contained over 20% more cadmium than Beech-Nut's already-
high internal limit.  *Id*.  Beech-Nut did not offer any explanation for this.  *Id*.

**<u>Mercury</u>**

38.     According to the Congressional Report, Mercury is third on the ATSDR's list of
substances in the environment that pose the most serious threat to human health.  *See id.* at 12.

Studies have shown that higher blood mercury levels in children 2 to 3 years old were associated with autistic behaviors among preschool age children.  *See id.* at 12-13.

39.     Outside of the baby food context, the EPA limits mercury in drinking water to 2 ppb.  *See id.* at 32.  Healthy Babies Bright Futures contends there should be no measurable mercury in baby food.  *See id.*

40.     The Congressional Report stated Beech-Nut did not even test for mercury in its ingredients or final baby food product.  *Id*. at 33.

41.     As to all of the Heavy Metals, the Congressional Report concluded that Beech-Nut's failure to test its finished product risks an **__undercount__** of toxic heavy metals in its finished baby foods.  *Id*. at 56 (emphasis added).  According to the Congressional Report, the baby food industry is aware that toxic heavy metal levels are higher after food processing.  *Id*. at 58.  The Congressional Report further stated that Beech-Nut's policy of testing only ingredients "recklessly endangers babies and children and prevents the compan[y] from even knowing the full extent of the danger presented by [its] products."  *Id*. at 56-57.

42.     Baby foods containing dangerous levels of toxic Heavy Metals bear no label or warning to parents.  But the Congressional Report makes clear that this is unacceptable and deceptive.

43.     As a result of its studies of toxic Heavy Metal levels in baby food, the House Subcommittee has recommended that parents should avoid baby foods that contain ingredients testing high in toxic Heavy Metals, such as rice products.  *See id*. at Findings, Paragraph 5.

44.     Baby food manufacturers hold a special position of public trust.  Consumers believe that they would not sell products that are unsafe.  Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food.  As the House

Subcommittee's Report reveals, baby food manufacturers, including Defendant, have violated the public trust. *See id*. at Findings, Paragraph 6.

45.     Despite the dangerous levels of toxic and Heavy Metals that Defendant knows to be contained in its Tainted Baby Foods, as noted above, on its website, Defendant falsely represents to parents that it has a strong commitment to health and nutrition as well as the quality and safety of its baby products.  Defendant's website states: "Making high quality, safe, and nutritious foods for babies and toddlers will always be our #1 priority."  It further touts its "Food Quality & Safety": "We take our responsibility very seriously to find the purest, cleanest fruits and vegetables out there, while adhering to rigorous quality standards. … We've been testing our ingredients for contaminants such as heavy metals and pesticides since 1985, and we're aware of no higher standards in the industry than ours."[9]  Moreover, Defendant represents: "We continuously improve our food safety and quality standards based on the most up to date scientific technology."[10]  Defendant also states, "We know moms, dads and caregivers depend on our commitment to help keep their children healthy and thriving. As a company of parents … we take the responsibility to provide safe, nutritious food as our highest purpose for over 130 years…. [W]hen our foods reach your little one's highchair, you can feel confident you're giving your baby the best."[11]  Each of these statements is materially false and misleading given Defendant's sales of its Tainted Baby Foods.

46.     Based on Defendant's decision to advertise, label, and market its Tainted Baby Foods as healthy, nutritious, and safe for consumption, it had a duty to ensure that these statements were true and not misleading, which it failed to do.

---

[9] www.beechnut.com/food-quality-safety/ (last accessed February 16, 2021).
[10] *Id*.
[11] *Id*.

47.     The Tainted Baby Foods are available at numerous retail and online outlets. However, as discussed above, Defendant fails to disclose they contain or are at risk of containing dangerous levels of Heavy Metals or other undesirable toxins or contaminants.   Defendant intentionally omitted these contaminants to induce and mislead reasonable consumers to purchase its Tainted Baby Foods.

## III.   CLASS ACTION ALLEGATIONS

48.     Pursuant to the provisions of Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of herself and a nationwide Class defined as:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in the United States for personal/household use, and not for resale (the "Class" or "Nationwide Class").**

49.     Plaintiff Gabrielle Stuve also seeks to represent a subclass (the "New York Subclass"), defined as follows:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in New York for personal/household use, and not for resale.**

50.     Plaintiff Robyn Moore also seeks to represent a subclass (the "Pennsylvania Subclass), defined as follows:

> **All persons who, during the applicable statute of limitation period to the present, purchased Defendant's Tainted Baby Foods in Pennsylvania for personal/household use, and not for resale.**

51.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3) are satisfied.   Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

52.     **Numerosity:** All requirements of Fed. R. Civ. P. 23(a)(l) are satisfied.   The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.   While Plaintiffs are informed and believe that there are thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs.   Plaintiffs believe that the identity of Class members is known or knowable by Defendant or can be discerned through reasonable means.   Class members may be identified through objective means.   Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

53.     **Commonality and Predominance:** All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied.   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a.   whether Defendant engaged in the deceptive and misleading business practices alleged herein;

   b.   whether Defendant knew or should have known that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

   c.   whether Defendant represented and continues to represent that the Tainted Baby Foods are healthy, nutritious, made from the best ingredients, and safe for consumption;

   d.   whether Defendant represented and continues to represent that the manufacturing of its Tainted Baby Foods is subjected to rigorous quality standards;

e.  whether Defendant failed to disclose that the Tainted Baby Foods contained dangerous levels of Heavy Metals;

f.  whether Defendant had knowledge that those representations were false, deceptive, and misleading and was unjustly enriched by its actions;

g.  whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

h.  whether the misrepresented and/or omitted facts are material to a reasonable consumer;

i.  whether Defendant violated N.Y. Gen. Bus. Law §§ 349 and 350;

j.  whether Defendant violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PS § 201 *et seq.*;

k.  whether Plaintiffs and members of the Class were injured and suffered damages;

l.  whether Defendant's misconduct proximately caused Plaintiffs and the Class members' injuries; and

m.  whether Plaintiffs and members of the Class are entitled to damages and, if so, the measure of such damages.

54.   **Typicality:** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied.  Plaintiffs are members of the Nationwide Class and New York or Pennsylvania Subclasses, having purchased for personal/household use Tainted Baby Food products that were manufactured by Defendant. Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendant's conduct.

55.     **Adequacy of Representation:** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied.   Plaintiffs are adequate Class representatives because they are members of the Nationwide Class and New York or Pennsylvania Subclasses and their interests do not conflict with the interests of the other members of the Class that they seek to represent.   Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interests in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously.   Plaintiffs, and their counsel, will fairly and adequately protect the Class's interests.

56.     **Predominance and Superiority:** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied.   As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' individual case will also resolve them for the Class's claims.   In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.   Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

57.     **Cohesiveness:** All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied.  Defendant has acted, or refused to act, on grounds generally applicable to the Class making final declaratory or injunctive relief appropriate.


## IV.     CAUSES OF ACTION

<u>**COUNT I**</u>
**Violations of New York Consumer Law for Deceptive Acts and Practices**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiff Stuve and the New York Subclass)**

58.     Plaintiff Stuve, individually and on behalf of the New York Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

59.     New York General Business Law ("NYGBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

60.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 349.  The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 349, and the deception occurred in part within New York State.

61.     Defendant's Tainted Baby Foods contain unhealthy and dangerous levels of Heavy Metals.  Defendant knew or should have known that its baby food should not contain these levels of Heavy Metals and/or at the amounts found therein and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals, Plaintiff Stuve and the New York Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

62.     Plaintiff Stuve and the New York Subclass members would not have purchased

the Tainted Baby Foods at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

63.     Defendant violated the NYGBL § 349 by using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value of Defendant's Tainted Baby Foods.

64.     If Defendant had not sold baby food tainted with Heavy Metals, Plaintiff Stuve and the other New York Subclass members would not have suffered the extent of damages caused by Defendant's sales.

65.     Defendant's practices, acts, policies and course of conduct violate NYGBL § 349 in that, among other things, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Stuve and the New York Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's products contained dangerous levels of toxic Heavy Metals; and Defendant failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiff and the New York Subclass members.

66.     The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its Tainted Baby Foods.

67.     Members of the public, including Plaintiff Stuve and the members of the New York Subclass, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

68.     Such acts and practices by Defendant are and were likely to mislead a reasonable

19

consumer purchasing baby food from Defendant. Said acts and practices are material. The sales of Defendant's Tainted Baby Foods in New York through such means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 349.

69.     As a direct and proximate cause of Defendant's conduct, Plaintiff Stuve and the New York Subclass members suffered damages as alleged above. Plaintiff Stuve also seeks injunctive relief as described herein.

70.     In addition to or in lieu of actual damages, because of the injury, Plaintiff Stuve and the New York Subclass members seek statutory damages for each injury and violation which has occurred.

**COUNT II**
**Violations of New York Consumer Law for False Advertising**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of Plaintiff Stuve and the New York Subclass)**

71.     Plaintiff Stuve, individually and on behalf of the New York Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

72.     NYGBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

73.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the NYGBL § 350. The conduct alleged herein is a "business practice" within the meaning of the NYGBL § 350, and the false advertising occurred in part within New York State.

74.     Defendant's baby food contains unhealthy and dangerous levels of Heavy Metals. Defendant knew or should have known that its baby food should not contain these Heavy Metals and/or at the amounts found therein and that by manufacturing and providing for

commercial sale baby food with toxic levels of Heavy Metals, Plaintiff Stuve and the New York Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

75.     Plaintiff Stuve and the New York Subclass members would not have purchased the baby food at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

76.     Defendant violated the NYGBL § 350 by failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's Tainted Baby Foods.

77.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiff Stuve and the other New York Subclass members would not have suffered the extent of damages caused by Defendant's sales.

78.     Defendant's practices, acts, policies and course of conduct violate NYGBL § 350 in that, among other things, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Stuve and the New York Subclass members at the time they purchased the Tainted Baby Foods, including the fact that Defendant's products contained dangerous levels of  toxic Heavy Metals; and Defendant failed to disclose and give timely warnings or notices regarding the presence of dangerous levels of toxic Heavy Metals in its baby food products that were purchased by Plaintiff and the New York Subclass members.

79.     The aforementioned conduct constitutes an unconscionable commercial practice in that Defendant has, by the use of false statements and/or material omissions, failed to properly represent and/or concealed the presence of unacceptable dangerous levels of Heavy Metals in its baby foods.

80.     Members of the public, including Plaintiff Stuve and the members of the New York Subclass, were deceived by and relied upon Defendant's affirmative misrepresentations and failures to disclose.

81.     Such acts by Defendant are and were likely to mislead a reasonable consumer purchasing baby food from Defendant.  Said acts and practices are material.  The sales of Defendant's Tainted Baby Foods in New York through such means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer protection statute, NYGBL § 350.

82.     As a direct and proximate cause of Defendant's conduct, Plaintiff Stuve and New York Subclass members suffered damages as alleged above and also seek injunctive relief as described herein.

83.     In addition to or in lieu of actual damages, because of the injury, Plaintiff Stuve and the New York Subclass members seek statutory damages for each injury and violation which has occurred.

**COUNT III**
**Violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**73 PS § 201 et seq.**
**(On Behalf of Plaintiff Moore and the Pennsylvania Subclass)**

84.     Plaintiff Moore, individually and on behalf of the Pennsylvania Subclass, repeats and re-alleges the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

85.     Plaintiff Moore and the Pennsylvania Subclass are "[p]erson[s]" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") 73 PS § 201-2, *et seq.*

86.     The Pennsylvania UTPCPL declares unlawful "unfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce …."

87.    The UTPCPL at 73 P.S. § 201-2 prohibits the following conduct: "(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another."

88.    Defendant engaged in, and continues to engage in, the above-referenced deceptive acts and unfair trade practices in the conduct of business, trade, and commerce, including by misrepresenting and omitting material facts regarding its Tainted Baby Foods. Defendant's Tainted Baby Foods contain unhealthy and dangerous levels of Heavy Metals. Defendant knew or should have known that its Tainted Baby Foods should not contain these levels of Heavy Metals and/or at the amounts found therein and that by manufacturing and providing for commercial sale baby food with toxic levels of Heavy Metals Plaintiff Moore and the Pennsylvania Subclass members were not getting healthy and/or nutritious food to help their children grow strong.

89.    Plaintiff Moore relied on Defendant's deceptive acts, unfair trade practices, material misrepresentations and omissions, which are described above.  Plaintiff Moore has suffered injury in fact and lost money as a result of Defendant's unlawful, unfair, and fraudulent practices.

90.    Defendant's wrongful conduct caused Plaintiff Moore and the Pennsylvania Subclass to suffer an ascertainable loss by causing them to incur substantial expense in purchasing the Tainted Baby Foods which they reasonably believed were safe and nutritious for their babies when these products contained dangerous levels of Heavy Metals.  Plaintiff Moore and the Pennsylvania Subclass have suffered an ascertainable loss by receiving less than what was promised.

91.     Plaintiff Moore and the Pennsylvania Subclass members would not have purchased the Tainted Baby Foods at issue for their children had they known the truth about the presence of dangerous levels of toxic Heavy Metals.  There is no other use for Defendant's tainted products.

92.     Defendant's actions described herein constitute fraud within the meaning of the UTPCPL § 201 *et seq.* by using dangerous levels of toxic Heavy Metals and failing to properly represent, both by affirmative conduct and by omission, the nutritional value and safety of Defendant's Tainted Baby Foods.  Defendant's actions were likely to mislead Plaintiff Moore and the Pennsylvania Subclass into believing the products were safe, healthy and nutritious when they in fact contained dangerous levels of toxic Heavy Metals.

93.     If Defendant had not sold baby food tainted with dangerous levels of Heavy Metals, Plaintiff Moore and the other Pennsylvania Subclass members would not have suffered the extent of damages caused by Defendant's sales.

94.     Defendant's violations present a continuing risk to Plaintiff Moore and the Pennsylvania Subclass, as well as to the general public.  Defendant's unlawful acts and practices complained of herein affect the public interest and are highly likely to deceive a substantial portion of the consuming public.

95.     As a direct and proximate result of Defendant's business practices, Plaintiff Moore and the Pennsylvania Subclass members suffered injury in fact and lost money or property because they purchased and paid for products they otherwise would not have.  Plaintiff Moore and the Pennsylvania Subclass members are entitled to injunctive relief and attorneys' fees and costs.

96.     Pursuant to Pennsylvania UTPCPL § 201-4.1, Plaintiff Moore and the

Pennsylvania Subclass members seek an order of this Court requiring Defendant to disgorge all ill-gotten gains and awarding Plaintiff Moore and the Pennsylvania Subclass members full restitution of all monies wrongfully acquired by it by means of such "unlawful" and "unfair" conduct, so as to restore any and all monies to Plaintiff Moore and the Pennsylvania Subclass members which were acquired and obtained by such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained by Defendant.

97.     Plaintiff Moore and the Pennsylvania Subclass members are entitled to treble actual damages of not less than $100, plus reasonable attorneys' fees and costs.  73 P. S. §201-9.2.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs Moore, Stuve, and the Nationwide Class)**

98.     Plaintiffs, individually and on behalf of the Class, repeat and re-allege the allegations contained in paragraphs 1 through 57 as though fully set forth herein.

99.     Plaintiffs and Class members conferred a monetary benefit on Defendant. Specifically, they purchased baby food from Defendant and provided Defendant with their monetary payment.  In exchange, Plaintiffs and Class members should have received from Defendant goods and services that were healthy and nutritious and not tainted with dangerous levels of Heavy Metals.

100.     Defendant knew that Plaintiffs and Class members conferred a benefit on them and accepted or retained that benefit.  Defendant profited from Plaintiffs' purchases and used Plaintiffs and Class members' monetary payments for business purposes.

101.     Defendant failed to disclose to Plaintiffs and Class members that its Tainted Baby Foods were unhealthy and contained dangerous levels of Heavy Metals and did not provide

product that Plaintiffs and Class members were promised.

102.     If Plaintiffs and Class members knew that Defendant's Tainted Baby Foods were unhealthy and toxic as alleged herein, they would not have purchased Defendant's Tainted Baby Foods.

103.     Plaintiffs and Class members have no adequate remedy at law.

104.     Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class members conferred on them.

105.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class members, proceeds that they unjustly received from them.  In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class members overpaid.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully requests that the Court:

a)    Certify the Nationwide Class, including the New York and Pennsylvania Subclasses, and appoint Plaintiffs and their counsel to represent the Nationwide Class and New York and Pennsylvania Subclasses;

b)    Find that Defendant engaged in the unlawful conduct as alleged herein and enjoin Defendant from engaging in such conduct;

c)    Enter a monetary judgment in favor of Plaintiffs and the Class, including the New York and Pennsylvania Subclasses, to compensate them for the injuries suffered, together with pre-judgment and post-judgment interest, punitive damages, and penalties where appropriate;

d)      Require Defendant to rectify all damages caused by its misconduct;

e)      Award Plaintiffs and the Class, including the New York and Pennsylvania Subclasses, reasonable attorneys' fees and costs of suit, as allowed by law; and

f)      Award such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  February 16, 2021                    Respectfully submitted,

*/s/ Lori G. Feldman*
Lori G. Feldman, Esq. (LF-3478)
**GEORGE GESTEN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Phone: (917) 983-9321
Fax: (888) 421-4173
Email: LFeldman@4-justice.com
E-Service: eService@4-Justice.com

David J. George, Esq.
Brittany L. Brown, Esq.
**GEORGE GESTEN MCDONALD, PLLC**
9897 Lake Worth Road, Suite #302
Lake Worth, FL 33467
Phone: (561) 232-6002
Fax: (888) 421-4173
Email: DGeorge@4-Justice.com
E-Service: eService@4-Justice.com

Janine L. Pollack, Esq.
Michael Liskow, Esq.
**CALCATERRA POLLACK LLP**
1140 Avenue of the Americas
9th Floor
New York, New York 10036
Phone: (917) 899-1765
Fax:  (332) 206-2073
Email:  jpollack@calcaterrapollack.com
Email:  mliskow@calcaterrapollack.com

***Counsel for Plaintiffs***